IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| KIMBERLY DUNN, | ) | |
| | ) | |
| Plaintiff, | ) | 4:18CV3159 |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| ANDREW SAUL, Commissioner of | ) | **AND ORDER** |
| the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Kimberly Dunn brings this action under Title II of the Social Security Act, which provides for judicial review of "final decisions" of the Commissioner of the Social Security Administration. 42 U.S.C. § 405(g) (Westlaw 2019).[1]

## I. NATURE OF ACTION & PRIOR PROCEEDINGS

### A. **Procedural Background**

Dunn filed an application for Title II disability benefits on January 12, 2016, alleging disability beginning on June 16, 2015. (Tr. 236.[2]) The claims were denied initially and on reconsideration. Following a December 7, 2017, hearing (Tr. 100-131), an administrative law judge ("ALJ") found on March 19, 2018, that Dunn was not disabled as defined in the Social Security Act. (Tr. 25.) On September 20, 2018,

---

[1]As of June 17, 2019, Andrew Saul is the Commissioner of the Social Security Administration and is automatically substituted as a party. *See* Fed. R. Civ. P. 25(d); *see also* 42 U.S.C. § 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2]Citations to "Tr." refer to the administrative transcript, which can be found at Filing Nos. 8 and 9.

the Appeals Council of the Social Security Administration denied Dunn's request for review. (Tr. 1.) Thus, the decision of the ALJ stands as the final decision of the Commissioner. *Sims v. Apfel*, 530 U.S. 103, 107 (2000) ("if . . . the Council denies the request for review, the ALJ's opinion becomes the final decision").

**B.     ALJ's Determination**

Following the five-step sequential analysis[3] for determining whether an individual is "disabled" under the Social Security Act, 20 C.F.R. § 404.1520, the ALJ concluded in relevant part:

(1)     Dunn may have engaged in substantial gainful activity since the alleged onset date, but "[f]uther development on this issue would not serve judicial economy and there is no need to postpone these proceedings to obtain further evidence on this point, as there exists a valid basis for denying the claimant's application . . . ." (Tr. 13.)

(2)     Dunn has two severe impairments—degenerative disc disease and bilateral carpal tunnel syndrome—and neither meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(3)     Dunn has the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. § 404.1567(b) with additional limitations:

---

[3] *See Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) ("During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work." (internal quotation marks and citation omitted)).

She can perform no climbing of ladders, ropes, or scaffolds. She can perform no more than occasional balancing, stooping, kneeling, crouching, and crawling. She can have no concentrated exposure to extreme cold temperatures, vibration, and hazards such as unprotected heights. She has no ability to drive. She has a need to alternate every 30 minutes between sitting and standing.

(4) Dunn cannot perform her past relevant work as a bus driver, but there are jobs in the light, unskilled category that exist in significant numbers in the national economy that Dunn can perform, including a routing clerk, mail sorter, and marking clerk.

(5) Dunn was not under a disability within the meaning of the Social Security Act from June 16, 2015, through the date of the ALJ's decision.

## C. Medical Factual & Opinion Evidence

The material medical and opinion evidence related to Dunn's physical impairments is undisputed and is described by the ALJ, in relevant part, as follows.[4]

### 1. Plaintiff's Testimony Regarding Her Symptoms

The claimant is a 52-year-old woman who alleged that she is unable to work due to low back pain, herniated and bulging disc, and walking with crutches. The claimant stated that she experiences back pain, along with tingling and muscle spasms in right leg. She alleged she has to change positions often due to her pain, and she stated that she can sit for only 5 to 10 minutes before needing to change positions. She testified that she uses a cane all of the time, except for when she uses her walker for going longer distances. She also stated that her sleep i[s] interrupted by having to change positions constantly, and she only gets four to five hours of

---

[4]The ALJ's citations to the record have been removed for ease of reading. The omitted citations may be viewed in Filing No. 8-2 at CM/ECF pp. 18-25.

sleep per night. She stated the side effects to her medication make her tired, dizzy, and itchy.

At the hearing, the claimant also alleged that she is unable to work due to carpal tunnel syndrome in the bilateral hands, which is worse in the left, dominant hand. She alleged that this condition has worsened over the years, and it is now to the point that she can barely lift anything.

. . . .

. . . The claimant reported that she is able to drive short distances and she can care for her day-to-day personal needs, although she is a little bit slower. She testified that she is able to prepare some simple meals and do light housework such as dusting.

(Tr. 17-18, 21.)

### 2. Plaintiff's Degenerative Disc Disease

. . . The evidence indicates that the claimant stopped working at her job as a bus driver on the alleged onset date. The day after the alleged onset date, on June 17, 2015, the claimant presented to her primary care physician, M. Olubunmi Dada, MD, with complaints of low back pain that radiated down the right leg. Dr. Dada observed that the claimant had antalgic[5] gait and some tenderness in the lumbosacral spine, and he prescribed medication and referred the claimant to physical therapy. At follow-up appointments on June 30, 2015, and July 20, 2015, the claimant continued to report back pain. Dr. Dada again observed tenderness, and he prescribed percocet and referred the claimant to a spinal surgeon.

On July 21, 2015, the claimant presented to J. B. Gill, MD, at Nebraska Spine Center for her low back and right leg pain. She reported at that time that she had tried physical therapy and percocet with moderate

---

[5]An antalgic gait is "a limp adopted so as to avoid pain on weight-bearing structures . . . characterized by a very short stance phase." Dorland's Illustrated Medical Dictionary at p. 753 (32nd ed.).

4

relief. Upon examination, Dr. Gill observed the lumbosacral spine exhibited tenderness on palpation, extension caused pain, and positive straight-leg raise testing on the right in the sitting position. He also noted some decreased response to tactile stimulation of the right leg, but he found 5/5 strength throughout, and although he noted she was using crutches to ambulate, he did not document any gait abnormalities upon examination. X-rays of the lumbar spine performed at that time showed only "slight" decreased disc height at L3-4, with no spondylolisthesis or scoliosis noted. An MRI of the lumbar spine showed L3-4 foraminal disc herniation that was compressing the right L3 nerve root. Dr. Gill provided the claimant with a transforaminal epidural steroid injection. The claimant received another epidural injection on September 1, 2015.

At a follow-up appointment with Dr. Gill on October 16, 2015, the claimant reported that although the injections had not provided relief for her low back pain, they provided about 80 percent relief of her leg pain. Dr. Gill made the same findings upon examination at that visit, and back surgery was planned. The claimant presented for a preoperative appointment on November 10, 2015, at which time Dr. Gill provided her a brace. A CT of the lumbar spine showed a single erosion superior facet laterally on the left sided L5-S1, but normal lumbar alignment without central or foraminal stenosis.

During this period, the claimant also continued to treat with Dr. Dada approximately once per month from July 2015 through November 2015. He continued to observe tenderness and documented that the claimant was utilizing crutches.

On December 2, 2015, the claimant underwent right L3-4 microendoscopic discectomy. Two months after surgery, on February 4, 2016, the surgeon Wendy Spangler, MD, noted that the claimant had "done very well," and although she continued to have pain in the right buttock region, she had resolution of the right lower extremity pain. Upon examination, Dr. Spangler observed that the claimant ambulated with a non-spastic gait; could heel raise and toe raise without difficulty bilaterally; had some tenderness in upper right buttock region, but no tenderness along lumbar spinous processes or paravertebral musculature; straight leg raise tests were negative bilaterally; had good lower

5

extremity strength bilaterally; stood from a seated position without any difficulty; and walked with a normal gait. Dr. Spangler noted the claimant had not done physical therapy yet, and she referred her to physical therapy.

On March 17, 2016, three months after surgery, the claimant reported to Dr. Spangler that she was engaged in physical therapy, and although she still noted some pain, she felt it was improving her symptoms. Dr. Spangler documented that the claimant had "mild" diffuse paraspinal tenderness and "slightly" antalgic gait, but she had full strength in the lower extremities, and she appeared well and in good spirits.

The claimant also followed up with Dr. Dada in February 2016 and March 2016, and she reported to him in March 2016 that she was "beginning to feel better." Dr. Dada noted at that time that the claimant was no longer using a walking cane or crutches to assist with walking, and she had normal range of motion and reflexes with no edema or tenderness.

The evidence shows the claimant participated in physical therapy from February to April 2016, and on April 5, 2016, she was in agreement that she was moving much better, including her lumbar range of motion and participation in daily activities, but was still frustrated about continuing pain on the right side around her lateral sacral region and SI joint region. Her physical therapist noted claimant had made "significant progress" with her participation in daily activities and improved gait mechanics, and she had the ability to complete lower extremity exercise and with increasing lumbar range of motion.

The record also shows that the claimant had returned to work, and in April 2016, she was performing work at levels of substantial gainful activity. However, that month the claimant reported that her back pain had returned similar to her pain before the surgery. Dr. Spangler noted that she was ambulating with an antalgic gait favoring the right leg, although she had full strength, no tenderness, and negative straight-leg raises. Despite her complaints of pain, an MRI of the lumbar spine performed on April 22, 2016, showed only "mild" facet arthropathy at L4-5 with "minimal" posterior lateral sac encroachment; "minimal"

annular bulging into the anterior epidural space at L5-S1; and was noted to be stable.

Dr. Dada's treatment notes from May 17, 2016, indicate that the claimant medically retired from her job with claims of continued pain, and in July 2016, he noted that she was using a cane. Dr. Dada observed that the claimant had an antalgic gait with tenderness of the lumbar back, but normal range of motion and no edema. By September 2016, the claimant reported continued pain, but she refused physical therapy and did not follow-up with the surgeon. Dr. Dada observed similar findings on examination, and he ordered the claimant a walker. Although her treatment providers continued to document the claimant's use of a cane, they did not indicate they observed the use of the walker at her appointments.

From September 2016 until October 2017, the claimant presented to Dr. Dada seven times. Dr. Dada continued to note the claimant's antalgic gait with use of a cane and tenderness, but also normal range of motion with no edema. He continued to prescribe percocet for her back pain.

In August 2017, the claimant reported experiencing uncontrollable movements, and Dr. Dada referred her to a neurologist for this. The claimant presented to Richard V. Andrews, MD, on October 18, 2017, upon Dr. Dada's referral. While the claimant described difficulties with her gait, she also described herself as, "for the most part, being physically healthy." Upon examination, Dr. Andrews documented the claimant's use of a cane and abnormal gait, with some weakness on the left anterior hip and knee, and lower extremity sensory deficit, most prominent in the distal right lower extremity. Dr. Andrews recommended that the claimant see another spine surgeon regarding a second opinion and scheduled a follow-up appointment.

(Tr. 18-20.)

### 3. **Plaintiff's Carpal Tunnel Syndrome**

With respect to the claimant's bilateral carpal tunnel syndrome, the medical evidence confirms that the claimant reported complaints of

numbness and tingling in her hands and wrists, left worse than right. The claimant testified that her left hand is her dominant hand. Beginning in September 2016, Dr. Dada often observed that her left wrist exhibited tenderness upon examination, and in December 2016, he documented positive Tinel's test of the left wrist. However, at that appointment, the claimant reported she was "not really interested in surgery" for carpal tunnel syndrome.

In September 26, 2017, the claimant presented to Gangadasu Sagar Reddy, MD, regarding her carpal tunnel syndrome. He documented that the bilateral radial artery pulsations were palpable, there was tenderness, and she had positive Durkin's test and positive Phalen's sign bilaterally. However, Dr. Reddy also observed there was no thenar muscle wasting, no sensory loss, and normal range of motion of the wrist. He noted that nerve conduction studies showed increased peak distal latency on anti-sensory examination bilaterally, with increased motor latency on the left wrist and normal motor latency on the right wrist. Dr. Reddy provided steroid injections to the wrist. At a follow-up appointment on November 7, 2017, the claimant reported that the injections had helped her, but she was experiencing a recurrence of tingling and numbness in the digits of both hands. Dr. Reddy made similar findings, and he discussed performing carpal tunnel release surgery, first on the left extremity, and then six weeks later on the right. His treatment notes indicate the claimant agreed to this plan, but at the hearing, the claimant testified that the surgery had not yet occurred.

(Tr. 21.)

### 4. Exertional-Limitation Opinions

#### a. State-Agency Medical Consultants

For the period of November 10, 2015, to November 9, 2016, Jerry Reed, MD, and Robert M. Roth, MD, agreed that Dunn was capable of light work; had no manipulative limitations; could occasionally lift or carry 20 pounds; could frequently lift or carry 10 pounds; could stand, walk, and sit for 6 hours in an 8-hour workday;

had an unlimited ability to push or pull, including the operation of hand controls; should avoid exposure to extreme cold and vibration; could occasionally climb ladders, ropes, and scaffolds, stoop, and crawl; could climb ramps and stairs and balance either frequently or with no limitation; and could kneel and crouch without limitation. (Tr. 137-139, 141, 150-151, 154.)

### b. Treating Physician

. . . In a form completed by Dr. Dada on September 14, 2015, he stated that the claimant would require frequent changes in positions; and that she should perform no overhead lifting or repetitive twisting, turning, or bending. He further opined that in an eight-hour day, she could sit for four hours, stand for three hours, and walk for two hours. In another form dated July 7, 2016, Dr. Dada stated she has severe limitation of functional capacity and is incapable of minimal sedentary activity. He stated she is unable to stand and walk and is unable to sit for more than 45 to 50 minutes. He ultimately opined that the claimant is totally disabled. In a third form dated December 1, 2016, he opined she could occasionally carry up to 10 pounds, could never climb, and could occasionally perform activities such as sitting, standing, walking, bending, kneeling, driving, fingering, handling, operating foot controls, and reaching above the shoulder. He noted that she has to use a cane or walker when walking.

. . . .

Dr. Dada provided a note dated April 12, 2016, in which he stated that the claimant could return to work on May 16, 2016, but that if she did not improve significantly by that time, she would have to consider early retirement on medical grounds. On May 17, 2016, he provided another note in which he opined that the claimant was unable to return to work as of April 21, 2016. He opined that she is unable to sit, stand, twist, turn, bend, kneel, or walk for more than 15 minutes secondary to severe and intractable plain. He opined she is unable to lift more than 10 to 15 pounds without pain. He also stated she experiences pain in her daily activities. . . .

(Tr. 22-23.)

## II. ISSUES ON APPEAL

Dunn asserts that the ALJ erred in (1) finding that Dunn has the RFC to perform jobs at the light exertional level because (a) Dunn's additional limitations require placing Dunn at the sedentary exertional level pursuant to S.S.R. 83-12 and (b) the ALJ failed to consider the impact of Dunn's use of an assistive device pursuant to S.S.R. 83-10; and (2) failing to give greater weight to the opinion of Dunn's treating physician that Dunn is limited to sedentary work.

## III. STANDARD OF REVIEW

The court may reverse the Commissioner's findings only if they are not supported by substantial evidence or result from an error of law. *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086, 1089 (8th Cir. 2018); 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In determining whether evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. If substantial

evidence supports the Commissioner's conclusion, the court may not reverse merely because substantial evidence also supports the contrary outcome and even if the court would have reached a different conclusion. *Nash*, 907 F.3d at 1089. The Eighth Circuit has repeatedly held that a court should "'defer heavily to the findings and conclusions of the Social Security Administration.'" *Wright v. Colvin*, 789 F.3d 847, 852 (8th Cir. 2015) (quoting *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010)).

## IV. DISCUSSION

### A. **Formulation of RFC**

#### 1. **S.S.R. 83-12**

Dunn asserts that the ALJ should not have found her able to perform jobs at the light[6] exertional level because Dunn's additional limitations require placing her at the sedentary[7] exertional level pursuant to S.S.R. 83-12. Titles II & XVI: Capability to Do

---

[6]According to the Social Security regulations:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

[7]The Social Security regulations define "sedentary work" as:

Other Work—The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work, SSR 83-12 (S.S.A. 1983) (hereinafter "Framework"). Although not entirely clear, Dunn seems to be arguing that the ALJ should have applied Grid Rule 201.14 to find Dunn disabled because her capacity for light work is significantly reduced. (*See* Filing No. 13 at CM/ECF p. 10 (arguing that because her additional restrictions "place the RFC between light and sedentary [and] [s]ince there is a significant reduction in the jobs, . . . the lower grid rule should be used"). Dunn misunderstands the meaning of S.S.R. 83-12.

S.S.R. 83-12 "is an attempt to provide guidance and does not require that an ALJ apply the Grids to find the claimant disabled. Rather, the ruling requires the use of a vocational expert in such situations . . . ." *Stone v. Colvin*, No. 4:14CV494, 2015 WL 1433469, at *11 (E.D. Mo. Mar. 27, 2015) (ALJ did not err in failing to apply Grid Rule 201.14 to find plaintiff disabled when ALJ properly elicited testimony from VE to determine effect of plaintiff's RFC on occupational base); *Framework* at ¶ 2(c) ("In situations where the rules would direct different conclusions, and the individual's exertional limitations are somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges of work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability. Accordingly, VS assistance is advisable for these types of cases."). Specifically, S.S.R. 83-12 "discusses the use of the medical-vocational guidelines as a framework for evaluating exertional limitations between ranges of work, and again suggests

---

> lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

consulting a vocational specialist in special situations such as when a claimant needs to alternate sitting and standing." *Offield v. Colvin*, No. 14-1060-CV-W-REL-SSA, 2016 WL 223716, at *18 (W.D. Mo. Jan. 19, 2016).

Because the ALJ here properly relied on a vocational expert to determine Dunn's capacity to perform other work, as contemplated by S.S.R. 83-12, Dunn's argument fails.

### 2. Use of Assistive Device

Dunn next argues that the ALJ's RFC should have included an assistive-device limitation in classifying her as capable of performing "light work" as described in S.S.R. 83-10. Titles II and XVI: Determining Capability to do Other Work—The Medical-Vocational Rules of Appendix 2, SSR 83-10 (S.S.A. 1983). The record establishes that the ALJ considered Dunn's use of an assistive device, but properly found that the evidence did not support any additional limitations. For example, although Dunn occasionally demonstrated an antalgic gait with occasional use of an assistive device, the record often indicated an intact gait, normal balance with no evidence of limping or ataxia, normal heel and toe walking, full range of motion in the hip, intact motor functioning, and normal muscle strength with no weakness or atrophy. (Tr. 314, 324-25, 329-30, 342-43.)

Additionally, only six months after Dunn's alleged onset date of June 16, 2015, she underwent a lumbar discectomy on December 5, 2015, and almost immediately showed improvement in her symptoms. (Tr. 19, 487.) Post-operative follow-up appointments in December 2015 and February 2016 showed that Dunn was doing very well; had resolution of her lower extremity pain; and exhibited full muscular strength, normal heel and toe raising, and intact ambulation with a normal gait. (Tr. 19, 485-87.) Dunn was also able to stand from a seated position, heel-to-toe raise without difficulty, demonstrate an intact gait, and exhibit negative straight-leg raising. (Tr. 19, 485.) Dunn's physical therapy notes from February, March, and April 2016 showed

improvement with better movement; improved gait; ability to sit and stand independently; and increased range of motion in the back with improving levels of pain. (Tr. 19, 465, 467, 469, 470-72, 479.)

By March 16, 2016, Dr. Dada noted that Dunn did not need a walking cane or crutches. (Tr. 19, 548.) Moreover, monthly examinations between March 2016 and October 2017 consistently showed full range of motion of the musculoskeletal system and normal reflexes. (Tr. 549, 556, 565, 569, 572, 575, 580, 583, 586, 616, 619, 622, 625, 628, 633, 645, 649, 652, 655, 660, 663, 666, 686-87, 690, 695, 699, 706, 710, 718, 722, 726, 730-31.) In addition, despite Dunn's complaints of knee pain, she also showed full strength in the lower extremities, normal range of motion in the knees, and intact motor functioning and strength in the knees. (Tr. 750-52.)

As to Dr. Dada's December 1, 2016, opinion that Dunn needed a cane or walker when walking and an electric wheelchair for extended journeys (Tr. 560), the ALJ properly gave little weight to such opinion for the reasons discussed in the next section of this Memorandum and Order.

Thus, there is substantial evidence in the record as a whole that supports the ALJ's decision to omit an assistive-device limitation from his RFC determination. *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008) (in determining RFC, ALJ was entitled to consider evidence as a whole and determine that plaintiff's alleged mental impairments were of the severity described by psychologist, rather than by plaintiff himself); *Guilliams v. Barnhart*, 393 F.3d 798, 803 (8th Cir. 2005) (ALJ must assess claimant's RFC based on all relevant evidence); 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

**B.**     **Weight Given to Opinions of Treating Physician**

Dunn complains that the ALJ, in formulating Dunn's RFC, erred in not giving

greater than partial weight to her physician's December 1, 2016, treating-source statement that Dunn is limited to the sedentary[8] exertional level. (Filing No. 13 at CM/ECF p. 11; Tr. 560, 563.) Dr. Dada's December 1, 2016, statement indicated that Dunn could occasionally carry up to 10 pounds, could never climb, and could occasionally sit, stand, walk, bend, kneel, drive, finger, handle, operate foot controls, and reach above the shoulder. He noted that Dunn "frequently uses a tens unit on her back, has to use a cane and/or walker when walking. Carpal tunnel in both hands. Electric wheelchair for extended journeys." (Tr. 560, 563 (capitalization corrected).)

An ALJ will give a treating physician's opinion controlling weight only if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with the other substantial evidence. *Myers v. Colvin*, 721 F.3d 521, 525 (8th Cir. 2013); *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (internal quotation marks and citation omitted). The ALJ is free to reject the opinion of any physician when it is unsupported in the physician's own treatment notes or other evidence of record. *Myers*, 721 F.3d at 525; *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006).

An ALJ's RFC determination is acceptable if it is supported by at least some medical evidence based on the ALJ's independent review of the record. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002); 20 C.F.R. § 404.1545(a)(3). There is

---

[8]Dr. Dada did not specifically state that Dunn is limited to sedentary work, but included functional limitations that are consistent with the Social Security regulations that define sedentary work.

15

no requirement that an RFC finding be supported by a specific medical opinion. *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers*, 721 F.3d at 526-27 (affirming RFC without medical opinion evidence)). The medical records themselves can provide sufficient support for the ALJ's RFC assessment. *Hensley*, 829 F.3d at 932. And, in assessing the claimant's RFC, it is the ALJ's role to resolve any conflicts in the evidence. *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008); *accord Estes v. Barnhart*, 275 F.3d 722, 725 (8th Cir. 2002).

Based on a careful review of the record, I conclude that the ALJ gave appropriate weight to the December 1, 2016, opinion of Dr. Dada because his opinion is inconsistent with other evidence in the record and was presented in a "checkbox" format having little evidentiary value. Specifically:

- The ALJ clearly and fully articulated the areas in which Dr. Dada's opinion was deficient, including that while Dr. Dada noted back pain and tenderness and an antalgic gait in some of his treatment notes, those same notes also contain numerous normal examination findings in Dunn's musculoskeletal system, such as full range of motion, no tenderness, normal reflexes, no edema, no joint swelling, and no arthralgias or myalgias. (Tr. 549-86, 616-66, 685-730.) *Aguiniga v. Colvin*, 833 F.3d 896, 902 (8th Cir. 2016) ("an ALJ may discount a treating source opinion that is unsupported by treatment notes"); *Martise v. Astrue*, 641 F.3d 909, 926 (8th Cir. 2011) ("When a treating physician's notes are inconsistent with his opinion, the Court may decline to give controlling weight to that opinion."); *Davidson v. Astrue*, 578 F.3d 838, 843 (8th Cir. 2009) ("It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes.").

- Dr. Dada found significant functional limitations in the face of generally negative MRI results, Dunn's refusal to engage in recommended medical treatment, and Dunn's sudden medical retirement from work within only one month of the sudden onset of increased pain. After her December 2015 back surgery, Dunn successfully underwent physical therapy, her symptoms were improving, she no

longer used a cane, and she returned to work. The record shows that in April 2016, she was performing work at levels of substantial gainful activity. However, on April 11, 2016, Dunn reported to Dr. Spangler, her back surgeon, that her back pain had returned to its pre-surgery intensity. (Tr. 495.) Dr. Spangler noted that she was ambulating with an antalgic gait favoring the right leg, although she had full strength, no tenderness, and negative straight-leg raises. Despite her complaints of pain, an MRI of the lumbar spine performed on April 22, 2016, showed "mild" facet arthropathy at L4-5 with "minimal" posterior lateral sac encroachment; "minimal" annular bulging into the anterior epidural space at L5-S1; and was noted to be stable. (Tr. 490-91.) Following the MRI, a May 5, 2016, "chart note" from Dr. Dada's office interpreted the results: "[S]he mostly appears to have scar tissue in the region of surgery. The radiologist did not think there was a recurrent disc, Dr. Spangler feels this is very small relative to the scar tissue. She would recommend continued therapy, perhaps aquatic based as the land aggravated her symptoms. She should f/u with Dr. Spangler in 1 month to reassess her return to work." (Tr. 589.) Contrary to her doctors' advice, Dunn refused physical therapy and did not follow up with her back surgeon (Tr. 555), yet she medically retired from her job with complaints of continued pain sometime between April 22, 2016 (the date of the MRI), and May 17, 2016, when she returned to Dr. Dada, who observed an antalgic gait with tenderness of the lumbar back, but normal range of motion and no edema. (Tr. 544.)

- Dr. Dada's December 1, 2016, opinion primarily consisted of checkbox responses that lacked rationale. Such opinions are disfavored. *Anderson v. Astrue*, 696 F.3d 790, 793-94 (8th Cir. 2012) (holding conclusory checkbox form has little evidentiary value when it provides little or no elaboration and cites no medical evidence); *Wildman*, 596 F.3d at 964 (ALJ properly discounted physician's opinion as conclusory when it consisted of three checklist forms, cited no medical evidence, and provided "little to no elaboration"); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (ALJ properly discounted physician's medical source statement because statement contained limitations that "stand alone," did not exist in physician's treatment notes, and were not corroborated through objective medical testing).

It should be noted that the ALJ did not entirely reject Dr. Dada's opinions. While the ALJ gave only partial weight overall to Dr. Dada's sedentary limitations, the ALJ adopted as part of his RFC Dr. Dada's December 1, 2016, limitations of no climbing and occasional kneeling. Further, by incorporating a 30-minute sit/stand accommodation as part of his RFC, the ALJ adopted Dr. Dada's December 1, 2016, restriction of occasional sitting, standing, and walking; his September 14, 2015, limitation of frequent position changes; and his July 7, 2016, opinion that Dunn is unable to sit for more than 45 minutes to one hour. It is permissible for an ALJ to accept some limitations in a doctor's opinion while rejecting other limitations. *See Martise*, 641 F.3d at 926 ("the ALJ did not entirely reject Dr. Berland's opinion"); *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005) (ALJ properly discredited portion of doctor's opinion regarding standing/sitting limitation).

Accordingly, I conclude that the ALJ gave appropriate weight to the December 1, 2016, treating-source statement of Plaintiff's treating physician based on the record as a whole. *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (finding that if a treating physician's opinion is inconsistent with other substantial evidence, such as physical examinations or claimant's daily activities, the ALJ may discount or disregard the opinion).

## V. CONCLUSION

Because this court must "defer heavily to the findings and conclusions of the Social Security Administration," *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010), and because substantial evidence in the record as a whole supports the ALJ's conclusion that Dunn has the residual functional capacity to perform light work with additional limitations, this court may not reverse the ALJ's decision "even if inconsistent conclusions may be drawn from the evidence." *McNamara v. Astrue,* 590 F.3d 607, 610 (8th Cir. 2010).

Accordingly,

IT IS ORDERED:

1. Plaintiff's Motion for Order Reversing Commissioner's Decision (Filing No. 13) is denied.

2. Defendant's Motion to Affirm Commissioner's Decision (Filing No. 14) is granted.

3. The Commissioner's decision is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).

4. Judgment will be entered by separate document.

DATED this 2nd day of October, 2019.

BY THE COURT:

s/ *Richard G. Kopf*
Senior United States District Judge